IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID L. FAULKENBERRY,            )<br>                                                            )<br>            Petitioner,                           )<br>                                                            )<br>    v.                                                   )<br>                                                            )<br>JOSEPH L. McGRATH, Warden,   )<br>                                                            )<br>            Respondent.                      )<br>_____ ) | No. C 03-1057 MMC (PR)<br><br>**ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS** |

David Lawrence Faulkenberry ("petitioner") is a California prisoner who filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After reviewing the petition, the Court ordered respondent to show cause why the petition should not be granted based on petitioner's cognizable claims. Respondent has filed an answer, accompanied by a memorandum and exhibits, contending that the petition should be denied. Petitioner has not filed a traverse.

**PROCEDURAL BACKGROUND**

In 2000, petitioner was found guilty by a jury of aggravated assault with a deadly weapon, along with three prior felony convictions. The trial court sentenced petitioner to twenty-eight years to life in state prison. The California Court of Appeal affirmed the conviction and sentence and the California Supreme Court denied the petition for review. Petitioner also filed a petition for a writ of habeas corpus in the California Court of Appeal and

later in the California Supreme Court, and both petitions were denied without opinion.

**FACTUAL BACKGROUND**

The California Court of Appeal provided the following summary of the facts of the case:

> Appellant was found guilty after a jury trial of the crime of assault with a deadly weapon, after he admitted he stabbed a young man who was trying to remove appellant from a home where he was not welcome.
>
> On May 16, 2000, petitioner approached his neighbor Rhonda Ferguson (Rhonda) outside a local supermarket. Appellant began "yelling and screaming" at Rhonda about the fact that his dog had been attacked by Rhonda's dog. Rhonda, who was in the company of her friend Joell Sayney, drove away to avoid further contact with appellant, who was "very angry" and "ranting and raving."
>
> Later in the evening of the same day, appellant knocked on the front door of Rhonda's home. At the time, there were numerous young people inside the home. Rhonda was in her bedroom. The front door was opened by Alicia Provost (Alicia), who recognized appellant from around town. After appellant stated he wanted to speak with Rhonda, Alicia went to get her, while leaving the door open. Appellant, accompanied by his girlfriend (Minnie Williams), entered the home, uninvited but unopposed. He followed Alicia to Rhonda's bedroom where he continued his discussion or argument with Rhonda about the dog attack.
>
> Rhonda ordered appellant to leave the house, but he declined to do so. The two moved into the kitchen of the house while they argued. Appellant was "yelling and screaming" and Rhonda became frightened. During the argument, Rhonda's 19-year-old son Anthony Cichon (Anthony) came into the kitchen and twice asked appellant to leave. Appellant refused. Anthony grabbed appellant by the shoulder in an attempt to move him outside, but appellant resisted and they both fell to the floor, struggling and wrestling.
>
> Next, Rhonda's "adopted son," 20-year-old Joshua Muray (Josh), entered the kitchen to pull appellant off of Anthony. Josh came to the defense of Rhonda and Anthony because he knew appellant "was a nut and he would stab them. I know that's how he is. [¶] . . . [¶] . . . he's no good, and he did shit like this before."
>
> Josh and appellant began struggling and fighting. After Josh hit appellant three times, he felt a sharp pain in his stomach and retreated. Josh was yelling and screaming, "I got stabbed." Appellant had stabbed Josh with a long knife, which was black handled and about seven or eight inches long. Appellant was still holding the knife, which he must have brought with him, because Rhonda and Anthony testified it did not match any of the knives they had in the house.
>
> Anthony drove Josh to the hospital, and it was determined that he had suffered five stab wounds to the abdomen, including wounds to his colon and small intestine. One of the wounds had been just a half inch from the aorta. If the aorta had been cut, it would have caused Josh to bleed to death. He underwent surgery and survived.
>
> In his testimony, appellant admitted stabbing Josh but claimed he did so by accident after he was attacked. He denied bringing the knife with him to Rhonda's house, and claimed to have picked it up off the kitchen floor during the struggle. Grabbing the knife in his left hand, appellant stood up and threw both hands out, unintentionally stabbing Josh. Appellant testified he did not even know until the next day that he had stabbed someone.

See People v. Faulkenberry, No. A094407, slip op. at 2-3 (Cal.Ct.App. May 22, 2002)

(ellipses in original).

## DISCUSSION

A. <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." <u>See</u> 28 U.S.C. § 2254(a); <u>See</u> <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>See</u> 28 U.S.C. § 2254(d); <u>see</u> <u>also</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 402-04, 409 (2000). Habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 795-96 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)). A federal court must presume the correctness of the state court's factual findings. <u>See</u> 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court gives no reasoned explanation of its decision on a petitioner's federal claim, and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. <u>See</u> <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. <u>See</u> <u>id</u>.; <u>accord</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

3

B.  Legal Claims

    1.  Prosecutorial Misconduct

Petitioner claims that he is entitled to habeas relief because the prosecution failed to disclose exculpatory evidence that Joshua Muray (hereafter, "Muray") had a prior conviction for battery. Contrary to petitioner's claim, the record demonstrates that the prosecution did, in fact, disclose Muray's prior conviction. The prosecution, in a response to petitioner's motion for a new trial, explained that Muray's prior conviction had, in fact, been disclosed to defense counsel.[1] Specifically, the prosecutor represented: "In response to the defense's request for information of relevant convictions for potential witnesses, the People immediately ran RAP sheets for Joshua Muray, Anthony C[ichon], and Rhonda Ferguson . . . Joshua Murray had one conviction for violation of Penal Code [section] 242 and that fact was disclosed to the defense." (See Resp.'s Ex. A at 180 (Clerk's Transcript).) During the hearing on petitioner's motion for a new trial, the government again stated: "As for the [Penal Code section] 242 [conviction], that was disclosed to the defense." (See Resp.'s' Ex. B, vol. 10 at 7 (Reporter's Transcript ("RT")).) Additionally, at the hearing, petitioner's counsel at the hearing conceded that petitioner's trial counsel "apparently knew . . . about the prior Muray suffered." (See RT, vol. 10 at 12.) Petitioner does not point to anything in the record to support his claim that the prosecutor failed to disclose Muray's prior conviction. Accordingly, to the extent petitioner's claim of prosecutorial misconduct is based on a failure to disclose Muray's prior conviction, the claim fails.

Petitioner also claims that the prosecutor presented false testimony that petitioner brought a knife to the home of Rhonda Ferguson (hereafter, "Ferguson"). Only the knowing use of false or perjured testimony by a prosecutor in order to obtain a conviction violates the defendant's right to due process. See Napue v. Illinois, 360 U.S. 264, 269 (1959). Here, the

---

[1] One of the bases for petitioner's motion for a new trial was his trial counsel's assertedly ineffective assistance in failing to introduce Muray's prior conviction. The issue of whether the prosecutor had disclosed the prior conviction to defense counsel arose in connection with that issue.

4

prosecutor presented testimony by Ferguson and Anthony Cichon (hereafter, "Cichon"), both of whom testified they had never seen the knife before and that it was not a part of their knife collection.  Petitioner testified that he did not bring the knife with him, but, rather, had obtained it from the kitchen during the fight.  Such factual dispute as to the initial location of the knife does not establish that the testimony of Ferguson or Cichon was false, much less that the prosecutor knew it to be false.  Accordingly, to the extent petitioner's claim of prosecutorial misconduct is based on the presentation of false testimony, the claim likewise fails.

### 2. Ineffective Assistance of Counsel

Petitioner claims that he is entitled to habeas relief because his trial counsel provided ineffective assistance.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e. that it fell below an "objective standard of reasonableness" under prevailing professional norms.  See id. at 688.  The relevant inquiry is not what defense counsel could have presented, but rather whether the choices made by defense counsel were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  See Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  See id.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  See id. at 697; see also Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (noting with approval district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

### a. Failure to Introduce Prior Conviction of Witness

Petitioner alleges that his trial counsel failed to investigate Muray's battery conviction and pending battery charge.[2] Petitioner implies that the introduction of Muray's battery conviction would have bolstered his self-defense argument, which, in turn, could have resulted in a different verdict. The failure to present probative, noncumulative evidence in support of a chosen defense strategy is deficient performance absent a reasonable tactical justification. See Alcala v. Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003). In light of the other evidence presented at the trial, however, there is no reasonable likelihood that the evidence of Muray's prior conviction would have affected the verdict.

There was no evidence that Muray was the instigator of the physical altercation, let alone that he was acting in a threatening or dangerous manner, such that petitioner would have needed to use a knife to defend himself. Ferguson, Cichon and Muray all testified that the fight began with Cichon and petitioner wrestling on the floor, that Muray then intervened by pulling petitioner off Cichon, and that Muray and petitioner then fought, with petitioner stabbing Muray. (See RT vol. 3 at 9-13, 23-27, 38-41). Significantly, petitioner did not testify that Muray initiated the fight; rather, petitioner testified that someone grabbed him, that the fight continued on the ground between himself, Cichon, Ferguson, and Muray, and that petitioner stood up and accidentally stabbed Muray. (See RT, vol. 4, at 109-112.) Moreover, even if petitioner had established a ground for defending himself against Muray, petitioner's use of a knife far exceeded the amount of force necessary to do so. In California, it is well established that a defendant who uses a deadly weapon when faced with a probable danger of a lesser degree than great bodily injury may not rely on the right of self-defense. See People v. Lopez, 32 Cal.2d 673, 675 (1948). The fact that petitioner stabbed Muray, who was unarmed during the altercation, essentially precluded petitioner from successfully advancing a self-defense theory. Indeed, the outcome of the fight, in which petitioner suffered a "little knot" on the head, an

---

[2] The record does not reflect a battery charge pending at the time of trial, and petitioner's state habeas petition makes no reference to any such pending charge. (See Resp.'s Ex. F at 3, 5, 8-12, 17-19.)

6

1 abrasion to his knee and facial bruises, (see RT, vol. 4 at 111), as compared to Muray, who
2 received five stab wounds to the stomach requiring extensive surgery, (see RT, vol. 3 at 43),
3 demonstrates that it was Muray, not petitioner, who faced the danger of great bodily injury.
4 Under these circumstances, even with the introduction of Muray's prior battery conviction, no
5 reasonable probability exists that the jury would have found that petitioner's actions in stabbing
6 Muray multiple times were justified on the basis of self-defense.

      b. <u>Failure to Call Witness</u>

      Petitioner claims that trial counsel failed to call Crystal Dunaway ("Dunaway") as a witness, and that Dunaway would have corroborated petitioner's testimony that he did not arrive at Ferguson's home armed with a knife. Specifically, Dunaway gave a statement to the Lake County Sheriff's Department on May 16, 2000, regarding the incident, in which she told the police that she saw petitioner grab a steak knife off the kitchen table. (See Resp.'s Ex. F at 33.) This part of Dunaway's statement corroborates petitioner's testimony that he did not bring the knife to the house.[3]

      The majority of Dunaway's statement, however, contradicts petitioner's testimony. For example, petitioner claimed that after the fight, he left the knife on a cabinet in the kitchen (see RT, vol 4 at 113), whereas Dunaway said she saw him leave with the knife, (see Resp.'s Ex. F at 33). Additionally, petitioner testified that he was attacked in the kitchen by multiple persons all at once, (see RT, vol. 4 at 110-112), whereas Dunaway corroborated the testimony of Ferguson, Cichon, and Muray that petitioner first struggled with Cichon, that Muray attempted to break up the struggle, and that Muray and petitioner then fought, resulting in Muray's being stabbed by petitioner, (see Resp.'s Ex. F at 33). Moreover, petitioner testified that he found the knife on the floor, (see RT, vol. 4 at 111), whereas Dunaway stated petitioner grabbed it from a table, (see Resp.'s Ex. F at 33). Under such circumstances, counsel's failure to call Dunaway as a witness was reasonable because the potential damage her testimony could

---

[3] Dunaway's statement as to the knife is not necessarily inconsistent with the testimony of the prosecution's witnesses, however, as Dunaway was not present when the fight began.

have caused with respect to petitioner's version of the events outweighed its potential benefit. Consequently, counsel's decision not to call Dunaway as a witness does not constitute deficient performance.  For the same reason, specifically, that Dunaway's testimony was at least as harmful to petitioner as it was helpful, there is no reasonable likelihood that her testimony would have affected the verdict.

For the above reasons, petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

3. Right to Conflict-Free Counsel

Petitioner claims he is entitled to habeas relief because his trial counsel was unconstitutionally and prejudicially burdened by an undisclosed conflict of interest.  This conflict, petitioner further alleges, resulted in trial counsel's failing to use Muray's battery conviction for impeachment purposes.

Where the constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest.  See Wood v. Georgia, 450 U.S. 261, 271 (1981).  In order to establish a violation of the Sixth Amendment, a petitioner "who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) (footnote omitted). Specifically, a petitioner must show (1) that counsel "actively represented conflicting interests" and (2) that such conflict "adversely affected [counsel's] performance."  See Bragg v. Galaza, 242 F.3d 1082, 1086 (9th Cir.), amended, 253 F.3d 1150 (2001).  A theoretical or potential conflict is insufficient to constitute actual conflict.  See Bragg, 242 F.3d at 1087.

Petitioner's trial counsel is the contractor for the Indigent Representation Administration ("IRA") of Lake County, and, as such, assigns IRA subcontractors to represent indigent defendants.  (See Resp.'s Ex. F at 58-99.)  Under the terms of the contract between IRA and Lake County, the County reserves the right to terminate the contract if conflicts of interest occur in 10% or more of IRA's cases in a six month period.  (See id. at 66-67.)  Conflicts are defined as dual representation, the sharing of confidential information, or "ethical considerations such as those referred to in the Rules of Professional Conduct."  (See id. at

8

1    66.) The 10% threshold is measured by the number of subcontractors that declare conflicts of

2    interest in any consecutive six-month period. (See id. at 67.)

3          Petitioner argues that because Muray was represented by an IRA subcontractor during

4    the adjudication of Muray's battery case, petitioner's trial counsel's stake in preserving IRA's

5    contract with Lake County created a conflict of interest that adversely affected counsel's

6    performance. This conflict of interest, petitioner contends, is why trial counsel failed to

7    impeach Muray with his battery conviction.

8          Counsel's role with IRA did not create an actual conflict of interest. There is no

9    evidence that counsel's representation of petitioner, at a time when an IRA subcontractor had

10   previously represented Muray, posed any threat to the pecuniary interest of petitioner's trial

11   counsel. Representation under such circumstances does not fall under the contract's definition

12   of a conflict of interest, and there is nothing in the contract stating that such representation

13   would count toward the 10% cap.[4] Further, the contract requires that the contractor and

14   subcontractors maintain separate offices, thus avoiding "dual representation" as well as the

15   sharing of confidential information. (See Resp.'s Ex. F at 66.)[5]

16         Moreover, in order to establish an actual financial conflict, as opposed to the mere

17   possibility of a financial conflict, petitioner must show that his trial counsel "actively

18   represented conflicting interests" during petitioner's trial. See Cuyler, 446 U.S. at 350.

19   Although petitioner postulates that it was his counsel's role with IRA that caused counsel not to

20   introduce Muray's prior battery conviction, his counsel conducted a vigorous cross-

21   examination of Muray and petitioner offers no explanation as to how not introducing Muray's

22   prior conviction advanced or helped counsel's position with IRA or any other pecuniary

23   interest. In short, nothing in the record suggests trial counsel actively represented his own

24   financial interests during petitioner's trial. In sum, petitioner has failed to show an actual

---

[4] Indeed, there is no showing IRA was even approaching the 10% cap on conflict cases, (see id. at 58-99), or that Lake County was poised to terminate the contract with IRA.

[5] As discussed above, petitioner does not argue that trial counsel himself represented Muray.

9

conflict of interest existed or that any such claimed conflict adversely affected petitioner's defense. Consequently, there is no constitutional violation. See Strickland, 466 U.S. at 692.[6]

Accordingly, petitioner is not entitled to habeas relief on his claim of conflict of interest.

## CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file and terminate any pending motions.

**IT IS SO ORDERED.**

Dated: June 17, 2005

    /s/ Maxine M. Chesney
MAXINE M. CHESNEY
United States District Judge

---

[6] Petitioner further argues that the trial court should have ascertained if a conflict of interest existed, as the judge who sentenced Muray also presided over petitioner's trial. "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." Cuyler, 446 U.S. at 347 (footnote omitted). Here, as discussed, there is no showing that the trial court should have known any conflict existed between petitioner and trial counsel.